# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **ELDRICK BROOM,** | ) | |
| | ) | |
| | ) | **CIVIL ACTION** |
| **Petitioner,** | ) | |
| | ) | **NO.  16-40124-TSH** |
| **v.** | ) | |
| | ) | |
| **COMMONWEALTH OF** | ) | |
| **MASSACHUSETTS,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## ORDER AND MEMORANDUM ON PETITION FOR WRIT OF HABEAS CORPUS
### (Docket No. 1)

### July 23, 2019

**HILLMAN, D.J.**

In 2013, a jury found Eldrick Broom ("Broom") guilty of first-degree murder, on theories of extreme atrocity or cruelty and felony-murder with aggravated rape as the predicate felony.[1] On June 13, 2016, the Supreme Judicial Court ("SJC") affirmed his conviction. *Commonwealth v. Broom*, 474 Mass. 486 (2016).  On August 31, 2016, Broom petitioned this Court for writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. 2254. (Docket No. 1).  Broom alleges the following grounds for relief:

Ground One: The search of his cell phone violated the Fourth Amendment.

Ground Two: The judge's response to the jury's question without consulting counsel violated the Sixth Amendment and warranted a mistrial

---

[1] Petitioner was sentenced to life in prison without the possibility of parole on the murder conviction.  The conviction for aggravated rape was filed as it was the underlying felony supporting felony murder.

: "Justice will be better served by ordering a new trial due to multiple trial errors." *Id.* at 8.[2]

For the reasons stated below, Broom's Petition for Habeas Corpus is ***denied***.

## **Background**

The SJC summarized the evidenced introduced at Broom's trail as follows:

In 2010, the victim, who was from the Dominican Republic and the mother of three children, moved to New Jersey with her newborn baby, Thiago. Shortly thereafter, she relocated to Boston to seek medical treatment for Thiago. Although in July of 2011, the victim's sixteen year old daughter, Navila, joined her mother to help her take care of Thiago, the victim's husband of seventeen years and her other son remained in the Dominican Republic. By the time Navila came to Boston, the victim was living in an apartment on Fairlawn Avenue in the Mattapan section of Boston. In the spring, summer, and early fall of 2011, the defendant lived in an apartment across the hall from the victim. The defendant was living with his fiancée and their children.

The victim spoke very little English, and interacted in a substantive way only with her family members and the medical professionals who were providing services to Thiago. The victim sometimes left her keys in her apartment door at the Fairlawn Avenue apartment, and on three different occasions before the day she was killed, the defendant knocked on the door and returned the keys to her. Navila had never seen her mother and the defendant interact, except for the times he returned the keys and when they exchanged polite greetings as he passed them in the hall. At the end of October, 2011, the defendant and his fiancée, who was pregnant, moved to an apartment on Bismarck Street, which was part of the same apartment complex as the Fairlawn Avenue building. Despite the move, the defendant sometimes returned to the steps of the Fairlawn Avenue building to smoke marijuana at his "normal spot."

During the afternoon of Sunday, November 20, 2011, Navila and the victim used the online Skype program to talk with family members in the Dominican Republic. Thereafter, Navila, the victim, and Thiago went grocery shopping. When they returned to their apartment around 8 p.m., the defendant was on the front steps of the building. He helped them carry Thiago's carriage and the grocery bags up the steps, but did not enter the building. The family spent the evening alone together. At around 9 p.m., the victim put Thiago to bed. When Navila went to bed at around 10:30 p.m., she remained awake for the next one-half hour. The victim was in the living room using her computer. The bedroom door was open, and Navila heard no unusual sounds. The victim, Navila, and Thiago all slept in the same bedroom. The next morning, November 21, 2011, the victim was asleep in her bed when Navila left for school.

---

[2] Ground Three does not raise any new constitutional claims. In his supporting facts for Ground Three, Broom argues that evidence was unlawfully obtained from his cellphone and that the trial judge erred by responding to the juror's note without consulting with Broom's counsel. *See* Docket No. 1, at 8.

When Navila came home from school at around 2:40 p.m. that day, she found her mother dead on the floor in a bedroom other than the one in which the family slept. The victim was naked from the waist down, her shirt was pulled up around her neck, her bra was pulled down with her left breast exposed, a pair of blue jeans and a blue shirt were lodged underneath her body, and the blue jeans were turned inside out. Two socks and a universal serial bus (USB) cord were tied around the victim's neck; the cause of death was strangulation. The victim's cellular telephone, keys, and underwear were missing.

Navila identified the defendant through a photograph as the only neighbor she ever saw interact with her mother. The police visited the defendant's apartment and spoke to him on November 29. During the interview, which was recorded with his permission, the defendant voluntarily provided the police with a buccal swab. At that time, the defendant said nothing in that interview about any sexual relationship with the victim.

During the initial investigation of the crime scene on November 21, swabs were collected from the jeans and shirt that had been under the victim's body as well as the socks and USB cable from around her neck. Testing performed on swabs collected from the victim's body during an autopsy and on the samples taken from the other items revealed that the defendant's deoxyribonucleic acid (DNA) was included as being a possible contributor to DNA found on the anorectal swabs taken from the victim, as well as DNA found on stains on her jeans, and her shirt. Based on the Y-chromosome short tandem repeat (Y–STR) testing of a sample taken from the socks that had been used as a ligature, the defendant could not be excluded as a contributor to the mixture.

Cellular site location information (CSLI) associated with the defendant's cellular telephone number for the period from November 1 to December 1, 2011, revealed that on November 21, 2011, the defendant's cellular telephone activated a cell tower located on Clare Avenue in the Roslindale section of Boston at 11:45 a.m. and 3:33 p.m. No CSLI or telephone activity was generated between 12:22 p.m. and 3:33 p.m. The police obtained the defendant's cellular telephone call detail records of text messages from October 5, 2011, to December 7, 2011, and voice calls from October 1, 2011, to December 4, 2011. The victim's telephone number never appeared in any of the defendant's records.

The police also obtained records for the victim's cellular telephone number from November 18 through 23. The defendant's telephone number was not listed in the call logs associated with the victim's number. The records for November 21 revealed that the victim's voice mail was checked at 10:07 a.m. and 11:15 a.m., and an outgoing call was made at 11:15 a.m. An incoming call at 12:48 p.m. went to voice mail. The records reflect no cellular tower activity thereafter, meaning that the victim's cellular telephone was disabled in some way rendering it inoperable. The occupational therapist who worked with Thiago called the victim's cellular telephone on November 21 at 1:18 p.m. and 1:39 p.m., but received no answer. The victim's computer was last used at 11:17 a.m. that day.

The defendant testified at trial. He stated that he began noticing the victim beginning in June, 2011, found her keys in her door and returned them a few times. When he ran into her in the laundry room, he would give compliments and flirt with

her. Sometime in October, the flirtation in the laundry room led to a consensual sexual encounter in her apartment where he performed oral sex on her. He had an additional oral sexual encounter with the victim in her apartment before he moved to Bismarck Street. According to the defendant, his last sexual encounter with the victim occurred on November 20, the night before the murder. He observed the victim outside the apartment building with her children at around 8:30 to 8:40 p.m. and helped them with the stroller. He asked the victim if he could speak to her, but she did not say anything. Approximately ten to fifteen minutes later, he went inside the building and knocked on the victim's door. She opened the door, looked at him, and closed the door. He went back out to the front stairs. After another ten to fifteen minutes, she returned to where he was sitting and led him to the couch in her apartment. He performed oral sex on her, which led to sexual intercourse, and he ejaculated on her. He then got dressed and she let him out the front door. He did not see or hear anyone in the apartment while he was there. After he left the apartment, he took a bus to his work at the Boston Medical Center. He clocked into work at 10:57 p.m. that night.

When the defendant left work at 7:30 a.m. on the morning of November 21, he stayed at the house of a friend on Clare Avenue in Roslindale, because he did not have a key to his fiancée's apartment. The friend was not at home. At 11:45 a.m., the defendant's cellular telephone activated a cellular tower located on Clare Avenue. While at his friend's house, he telephoned his father and spoke with him for ten minutes. He then left his friend's house and took a bus to his fiancée's apartment to help her with groceries. He carried the groceries and stayed in the apartment for ten to twenty minutes. He then returned to his friend's house in Roslindale and stayed there until 4 p.m., although the friend again was not there.

*Broom*, 474 Mass. at 487–90.

## Legal Standard

The standard of review for habeas corpus petitions is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under this standard, a federal court may only grant the writ if the underlying state court adjudication resulted in a decision that either "(1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding.'" *Brown v. Ruane*, 630 F.3d 62, 66-67 (1st Cir. 2009) (quoting 28 U.S.C. § 2254(d)(1)-(2)).[3]

A state court decision is "contrary to" clearly established Supreme Court precedent when "it applies a rule that contradicts the governing law set forth in the Court's cases or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a different result." *Price v. Vincent*, 538 U.S. 634, 634-35 (2003). A state court unreasonably applies clearly established Supreme Court precedent "if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular case." *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014). "Evaluating whether a rule application was unreasonably requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Thus, in order to prevail on a petition for habeas under 28 U.S.C. § 2254(d)(1), the petitioner must demonstrate that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 101.

In addition, a petitioner is not entitled to habeas relief on the basis of a non-structural constitutional error, unless he "can establish that it resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation marks omitted). Specifically, a petitioner must show that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). When a state court

---

[3] The instant petition only implicates the first ground for relief—that the state court decision contrary to, or an unreasonable application of, federal law.

finds that a constitutional error was harmless beyond a reasonable doubt, "a federal court on habeas review may choose between two equally valid options. The court may apply *Esparza* [to assess whether the harmlessness determination was itself unreasonable] and then move on to the *Brecht* test only if the state court's decision was an unreasonable application of *Chapman*. Alternatively, the court may begin with the *Brecht* test directly." *Connolly v. Roden*, 752 F.3d 505, 511 (1st Cir. 2014); *see also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003); *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (describing the Court's holding in *Esparza* as where "a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."); *Connolly*, 752 F.3d at 511 ("There is clear logic [to this framework]: if an error had a 'substantial and injurious' effect on a jury's verdict . . . then it is necessarily unreasonable to conclude that the error was harmless beyond a reasonable doubt.").

## Discussion

### 1. Ground One

Broom alleges that the search of his cellphone and subsequent admission of evidence obtained from that search violated his Fourth Amendment rights.

Federal courts "ordinarily cannot revisit a state court's disposition of a prisoner's Fourth Amendment claims." *Sanna v. Dipaolo*, 265 F.3d 1, 8 (1st Cir. 2001); *see also Stone v. Powell*, 428 U.S. 465, 482 (1976); *Cavitt v. Saba*, 57 F. Supp. 3d 81, 91 (D. Mass. 2014) (stating that under *Stone*, "even if this Court believe that the state court had decided the [Fourth Amendment] issue wrongly . . . habeas relief could not follow"). This proposition, however, "is not absolute: there is an exception for instances in which a habeas petitioner had no realistic opportunity to litigate his Fourth Amendment claim fully and fairly in the state system." *Sanna*, 265 F.3d at 8. "The burden

is on the petitioner to show that he did not have a realistic opportunity to fully and fairly litigate his Fourth Amendment claim." *Silva v. Tompkins*, 2019 WL 1866317, at *18 (D. Mass. Apr. 25, 2019).

On December 28, 2012, Broom filed a motion to suppress the fruits of the search of his cellphone, which the Suffolk Superior Court denied on March 5, 2013. On direct appeal to the SJC, Broom again challenged the search of his phone. The SJC found that "the affidavit did not provide probable cause to search the contents of [Broom's] cellular telephone" and consequently, his "motion to suppress . . . should have been allowed." *Broom*, 474 Mass. at 497. The SJC determined, however, that "[c]onsidering the totality of the trial records . . . the error was harmless beyond a reasonable doubt." *Id.*

Here, there is no doubt that Broom had a full and fair opportunity to litigate his Fourth Amendment claim in the trail court and then on appeal to the SJC. Indeed, the SJC determined that the evidence was unlawfully obtained and should have been excluded, but that failure to do so was a harmless error. Accordingly, it is the SJC's harmless error finding that Petitioner seeks to challenged. "However, this Court's review of the SJC's harmless error finding 'implicitly involves a request for habeas relief on the basis of the trial court's failure to exclude evidence,' which is barred by *Stone*." *Dame v. Goguen*, 330 F. Supp. 3d 651, 655 (D. Mass. 2018) (quoting *Bastardo v. Marshall*, 1997 WL 667785, at *2 (D. Mass. Oct. 16, 1997)); *see also McCambridge v. Hall*, 68 F. Supp. 2d 1, 1 (D. Mass. 1999) (same); *Gilmore v. Marks*, 799 F.2d 51, 55 (3d Cir. 1986) ("[F]or purposes of the *Stone v. Powell* rule, a habeas petitioner's claim that a state appellate court improperly found a Fourth Amendment violation to be harmless does not have a separate

identity and may not be raised in a habeas petition in federal court."); *McDaniel v. State of Oklahoma*, 582 F.2d 1242, 1243-44 (10th Cir. 1978).[4]

Therefore, because Broom had a full and fair opportunity to litigate the suppression issue in the state court, he has failed to present a cognizable constitutional violation for habeas relief on Ground One.

### 2. *Ground Two*

Broom argues that the trial judge erred when he received a note and subsequently instructed the jury without consulting with counsel.[5]

---

[4] The facts of *Stone* also suggest that federal courts are prohibited from reviewing a state court's harmless error findings where the underlying claim is not reviewable. In *Stone*,

> Although the [Fourth Amendment] issue was duly presented [to the California District Court of Appeals], that court found it unnecessary to pass upon the legality of the arrest and search because it concluded that the error, if any, in admitting the testimony . . . was harmless beyond a reasonable doubt under *Chapman* . . . .

428 U.S. at 470. On these facts, the Court held that the petitioner had been afforded "an opportunity for full and fair litigation" of his Fourth Amendment claim.

[5] The text of the note was as follows:

> "I apologize for my ignorance. I believe it's my civic duty to say that the defense is focusing on cross-examining the wrong evidence. We've established that the fingernail and sock DNA results are *inconclusive*. I believe the defense should try and cross-examine the anorectal sperm DNA results. This is more fair for the defense. Writing this has not made me partial in any way, and I remain indifferent."

The judge instructed the jury as follows:

> "Now one other matter to address is a communication that I've received through the court officers from one . . . of our jurors commenting on some of the evidence that has been heard, and on the way in which the attorneys are presenting this evidence, and the juror reference[d] that they felt it was a civic duty to make these comments, notwithstanding that it would not in any way affect the juror's ability to be impartial, and that the juror remains indifferent. And I've discussed generally that I received a note, but not the content of the note with counsel, because the content of the note in some way reflects an individual juror's thoughts about the evidence, and it is no one's business as to what any of you may be thinking but you. But I do not want to just let the sending juror know that I have received this note, and to clarify that it is not the civic duty of any of you to seek out the evidence, or decide whether or not this case is being properly presented by one of the other or both sides in this case. Your sole duty in this case as a juror is to impartially listen to

The SJC concluded that the trial judge erred. *Broom*, 474 Mass. at 502. The SJC noted that existing caselaw requiring judges to consult with counsel before answering jurors' questions involved questions "delivered to the judge on behalf of the jury as a whole while they were deliberating on their verdict" while "[i]n this case, the note in question was from a single juror, and was written and delivered to the judge while the trial was still ongoing." *Id.*[6] Further, the SJC found the distinction to be "significant." *Id.* Nonetheless, the Court held that while it understood "the judge's concern that the substance of the question, if shown to counsel, would open a window into the individual thought process of the juror while the trial was still ongoing, it was error for the judge not to have allowed counsel to read the juror's note at or near the time it was delivered and to participate meaningfully in shaping the judge's response to it." *Id.*

The SJC, however, found that the error was harmless. To review the SJC's harmless error finding, I will begin and end with *Esparza*. *See Connolly*, 752 F.3d at 511 ("This case lends itself

---

the evidence presented, and at the end of this case then to impartially and fairly assess that evidence as part of the deliberating jury, to determine the facts from that evidence, and then to apply the law to that evidence, and through that process determine whether or not the Commonwealth has proved its case beyond a reasonable doubt. It is not your duty to suggest how a case ought to be tried or what evidence ought or ought not to be presented. So I want you to be aware that I do have the note, I have reviewed it, and that is my response to the note."

*Broom*, 474 Mass. at 500 n.18, 501 n.19.

[6] For instance, in *Fillippon v. Albion Vein Slate Co.*, the Supreme Court held that "*[w]here a jury has retired to consider of its verdict, and supplementary instructions are required, either because asked for by the jury or for other reasons, they ought to be given either in the presence of counsel or after notice and an opportunity to be present; and written instructions ought not to be sent to the jury without notice to counsel and an opportunity to object.*" 250 U.S. 76, 81 (1919) (emphasis added); *see also Shields v. United States*, 273 U.S. 583, 588 (1927) (extending the rule to criminal cases); *Rogers v. United States*, 422 U.S. 35, 39 (1975) ("Cases interpreting [Fed. R. Crim. P. 43] make it clear, if our decisions prior to the promulgation of the Rule left any doubt, that the [deliberating] jury's message should have been answered in open court and that petitioner's counsel should have been given an opportunity to be heard before the trial judge responded."); *United States v. Maraj*, 947 F.2d 520, 525-26 (1st Cir. 1991) ("We regard it as settled beyond peradventure that messages from a deliberating jury, pertaining to ongoing deliberations, ought to be fully disclosed to counsel and that counsel should be accorded an opportunity to be heard before the trial judge addresses the jurors.").

to the first approach [of first assessing the error under *Esparza*], because the petitioner has not met his burden to make the threshold showing that the SJC's conclusion that any error was harmless under *Chapman* was unreasonable.").

In finding the error was not harmless, the SJC explained its reasoning as follows:

> This is not a case where a deliberating jury asked a question seeking further guidance from the judge on a legal issue that presumably bore directly on their collective resolution of the case. Rather, the note reflected a single juror's observations about the trial strategy being followed by defense counsel in relation to one type of evidence as the trial was proceeding. Furthermore, although the judge did not share the entire contends of the juror's note with counsel before responding to it with an instruction, he summarized the substance of it. Finally, although the defendant lost the opportunity to convince the judge that some other or different response would be more appropriate, the instruction provided by the judge accurately reflected governing principles concerning the proper role and function of the jury, and did not prejudice the defendant in any respect. In the circumstances, although we question whether the harmless beyond a reasonable doubt standard applies here, the judge's error met this standard.

*Broom*, 474 Mass. at 502-503 (quotation marks and citations omitted).

"The harmless error inquiry depends significantly on the facts and is guided largely by the strength of the parties' cases." *Connolly*, 752 F.3d at 513. Given the claim of error here, the Court cannot say that the SJC's conclusion was an unreasonable application of *Chapman*. *See id.* ("An unreasonable application of *Chapman* must be objectively unreasonable, not merely wrong; even clear error will not suffice." (quotation marks and brackets omitted)). The SJC first noted that "although the judge did not share the entire contents of the juror's note with counsel before responding to it with an instruction, he summarized the substance of it." *Broom*, 474 Mass at 503. *Cf. United States v. Parent*, 954 F.2d 23, 26 (1st Cir. 1992) (noting that where a judge responded to a deliberating jury's note without parties' knowledge, "the real harm is not that the trial judge might have misstated the law . . . but that the aggrieved party will have lost the value of the chance: the opportunity to convince the judge that some other or different response would be more

appropriate, the circumstances considered"); *Fillippon*, 250 U.S. at 82 (describing such an error as "presumptively injurious").

Even if the error were considered presumptively injurious, however, it is improbable that Broom was harmed at all. *See Parent*, 954 F.2d at 25 ("A trial court's error in failing seasonably to inform counsel about a jury note does not require reversal if the error is benign."). First, although Broom lost the "opportunity to convince the judge that some other or different response would be more appropriate," *Parent*, 954 F.2d at 26, the judge's instruction accurately reflected the law and role of the jury. *See Broom*, 474 Mass. at 503. *Compare Commonwealth v. Davis*, 52 Mass. App. Ct. 75, 77-78 (2001) (finding reversible error where trial judge provided misleading and inadequate answer to jury question without consulting counsel), *with Maraj*, 947 F.2d at 526 (finding harmless error where the judge failed to inform the lawyers about the last sentence in the jury's note but the judge's response was "neither unduly coercive nor arguably unsatisfactory. Moreover, had the full note been contemporaneously disclosed, there was nothing more that defense counsel could appropriately have done to protect their clients' rights."). Second, even if the response were somehow flawed or Broom's counsel might have convinced the trial judge to craft a response more favorable to Broom, the note-writing juror was chosen as an alternate and consequently did not participate in the verdict. *See Broom*, 474 Mass. at 503 n.21. Accordingly, I agree that the error was harmless and find that the SJC did not unreasonably apply *Chapman*. Consequently, Broom is not entitled to habeas relief on Ground Two.

## Conclusion

For the reasons stated above, Broom's petition for writ of habeas corpus (Docket No. 1) is ***denied***.

## Certificate of Appealability

The statute governing appeals of final orders in habeas corpus proceedings provides that an appeal is not permitted "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a "substantial showing," a petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation marks omitted). This is a low bar; a claim can be considered "debatable" even if every reasonable jurist would agree that the petitioner will not prevail. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

I deny the COA with respect to Ground One. No reasonable jurist can debate that Broom had a full and fair opportunity to litigate this claim in state court. I also deny the COA with respect to Ground Two. While the trial judge did not allow Broom's counsel to participate in crafting a response to the juror's note, the response was an accurate statement of the law and the note-writing juror did not participate in the verdict. Accordingly, I find that no reasonable jurist would debate that the error was harmless.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**